## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
                                          )
**JANE DOE,**                             )
                                          )
            **Plaintiff,**                )
                                          )
        **v.**                            )
                                          )
                                          )        **Civil Action No. 15-11356**
**FRANK MEDEIROS and**                    )
**ELLIS MANAGEMENT SERVICES, INC.,**      )
                                          )
            **Defendants.**               )
                                          )
                                          )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **July 21, 2017**

### I.    Introduction

Plaintiff Jane Doe ("Doe") has filed this lawsuit against Defendants Frank Medeiros ("Medeiros") and Ellis Management Services, Inc. ("Ellis") alleging a number of claims related to a purported assault committed by Medeiros.  D. 11.  Ellis has moved for summary judgment on the vicarious liability claim leveled against it.  D. 51.  For the reasons stated below, the Court ALLOWS the motion.

### II.    Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no

1

genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the nonmoving party and make all reasonable inferences in that party's favor.  O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is appropriate if, after viewing the record in the nonmoving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Id. at 906-07.

## III.    Factual Background

The following facts are drawn from the parties' statements of material facts, D. 53, D. 58, and supporting documents and are undisputed unless otherwise noted.

Ellis, whose sole office is in Texas, provides mystery shopping services (also known as "secret shops") throughout the country for the apartment and multifamily leasing industry.  D. 53 ¶¶ 1-3; D. 58 ¶¶ 1-3.  These secret shops provide the client with a plethora of information including—but not limited to—feedback regarding their employees' performance, descriptions of the physical appearance of the clients' rental properties and notice of whether specific properties are in compliance with internal policies and regulations.  D. 53 ¶ 4; D. 58 ¶ 4.  In selecting secret shoppers to visit its clients' sites, Ellis requires no interview process.  D. 53 ¶ 9; D. 58 ¶ 9.  Rather, prospective secret shoppers do no more than fill out a basic application form online.  D. 53 ¶ 8; D.

58 ¶ 8.  A background check is performed on individuals who submit applications and, so long as they have no felony record and have not committed any sex-related crimes, they are eligible to work for Ellis as a secret shopper.  D. 53 ¶ 10; D. 58 ¶ 10.

All secret shoppers working for Ellis are required to sign a form entitled "Ellis, Partners in Mystery Shopping Independent Contractor Agreement & Authorization to Record Shopper Communications" (the "Agreement"), which states that Ellis has "no power or authority over the specific manner in which [the secret shopper] perform[s] [his or her] duties under this Agreement, that control belonging solely to the [secret shopper]."  D. 53 ¶¶ 11, 13; D. 58 ¶¶ 11, 13; D. 54-1 at 1, 3.[1]  The Agreement further stipulates that Ellis "is only concerned with the end result, namely, the collection of the necessary data for the Property identified in an Assignment."  D. 53 ¶ 13; D. 58 ¶ 13; D. 54-1 at 3.  Secret shoppers must also complete a "certification program" online that serves as a tutorial for those working on behalf of Ellis.  D. 53 ¶ 14; D. 58 ¶ 14.  This tutorial, which on average lasts between thirty to forty-five minutes, provides shoppers with tips pertaining to secret shopping assignments, such as how to communicate effectively while performing an assignment.  D. 53 ¶ 14; D. 58 ¶ 14.  Once a person has completed the certification program, he or she is eligible to perform mystery shops for Ellis's customers.  D. 54 ¶ 14.

Ellis's secret shoppers are provided a username and password to access a protected portion of Ellis's website that provides the secret shopper with a list of available assignments.  D. 53 ¶ 15; D. 58 ¶ 15.  Ellis does not inform its secret shoppers whether assignments are available and, instead, the onus is on the secret shopper to log in to the website to find available assignments.  D. 53 ¶ 16; D. 58 ¶ 16.  Whether to request an available assignment is in the secret shopper's discretion

---

[1] While Doe objects to the extent Ellis seeks to use the words of the Agreement to draw a legal conclusion as to the employment or agency status of secret shoppers, it does not dispute that the Agreement does, in fact, contain the quoted language.  D. 58 ¶ 13.

and Ellis imposes no minimum number of assignments a secret shopper must complete.  D. 53 ¶¶ 16-17; D. 58 ¶¶ 16-17.  In fact, Ellis does not require that a secret shopper complete even one assignment (i.e., they may elect to complete none).  D. 53 ¶ 17; D. 58 ¶ 17.

Secret shops are awarded to the first individual requesting the assignment so long as the individual is not a former employee of the client whose property is being shopped.  D. 53 ¶ 20; D. 58 ¶ 20.  While the Ellis online tutorial states that a secret shopper should "normally complete the telephone portion of the shopping assignment . . . on the same day [the secret shopper] shops the property," the secret shopper is otherwise free to decide the date and time of the shop within the timeframe set by the client.  D. 61-1 at 11-12; D. 53 ¶ 22; D. 58 ¶ 22.  During a secret shop, the Ellis worker poses as a person hoping to rent an apartment at the client's property.  D. 53 ¶ 23; D. 58 ¶ 23.  After visiting the apartment and observing the property and the employee, the shopper must then log on to Ellis's website and complete an online form that asks for specific information requested by the client.  D. 53 ¶ 25; D. 58 ¶ 25.  With the exception of completing the online form, secret shoppers are otherwise not required to communicate with Ellis before or after a shop unless they encounter difficulties in completing the assignment.  D. 53 ¶ 28; D. 58 ¶ 28; D. 61-1 at 26. Ellis does not provide any sort of evaluative feedback to the secret shoppers after they submit their reports, although Ellis, in its discretion, may reach out to the secret shopper if the questions in the report are not sufficiently answered or if Ellis determines that there is some other problem in the report.  D. 53 ¶ 29; D. 58 ¶ 29; D. 59-2 at 19-21.

Secret shoppers are paid a flat fee, not on an hourly or salary basis.  D. 53 ¶¶ 30-31; D. 58 ¶¶ 30-31.  They neither receive any fringe benefits from Ellis, nor do they have any deductions or withholdings taken from their pay by Ellis.  D. 53 ¶ 32; D. 58 ¶ 32.  Ellis does not reimburse secret shoppers for any expenses they incur during a secret shop.  D. 53 ¶ 33; D. 58 ¶ 33.  Ellis also does

not provide its secret shoppers with any office space.  D. 53 ¶ 34; D. 58 ¶ 34.  Secret shoppers are not required to wear any kind of uniform and are instead permitted to wear casual street clothing while performing an assignment.  D. 53 ¶ 36; D. 58 ¶ 36.  They also are not prohibited from working for other companies, including other secret shopping companies.  D. 53 ¶ 37; D. 58 ¶ 37.

Medeiros worked with about a dozen different secret shopping companies between 2009 and 2012, including companies that, like Ellis, evaluate apartments and other rental properties.  D. 53 ¶ 41; D. 58 ¶ 41.  In or around April 2011, Medeiros entered into an independent contractor agreement with Ellis to be a secret shopper.  D. 53 ¶ 43; D. 58 ¶ 43.  Between August and December 2011, Medeiros completed four secret shopping assignments with Ellis.  D. 53 ¶ 45; D. 58 ¶ 45.  During this time period, he performed secret shops with other companies.  D. 53 ¶ 49; D. 58 ¶ 49.  Medeiros never spoke with any representative of Ellis while working for them.  D. 53 ¶ 56; D. 58 ¶ 56.  He had no other contact with Ellis other than through Ellis's website and via e-mails confirming that he had been given an assignment to complete.  D. 53 ¶ 56; D. 58 ¶ 56.

Doe formerly worked as a property manager in Fall River, Massachusetts for Community Builders, a property management company.  D. 55-2.  On December 12, 2011, Medeiros scheduled a meeting with Doe to see apartments in Fall River as part of a secret shop assignment.  Id.  Doe claims that during the secret shop later that day, Medeiros asked her "if [she] was wired" and then "patt[ed] [her] chest down for wire."  Id.  Medeiros was fired from his job with Ellis once Ellis learned that he had been accused of inappropriately touching Doe's breasts during his scheduled secret shop.  D. 53 ¶ 63; D. 58 ¶ 63.  At no point did Ellis instruct or suggest that Medeiros engage in such conduct while on a mystery shop, nor did Medeiros's job require him to do so.  D. 53 ¶ 61, 62; D. 58 ¶ 61, 62.  Medeiros's secret shopping job with Ellis in no way required him to determine whether any person at any of his shopping assignments was "wearing a wire" or had a recording

device on her person.  D. 53 ¶ 62; D. 58 ¶ 62.  Medeiros also did not believe it was part of his job

to pat down or have such physical contact with Doe as part of his job with Ellis.  D. 53 ¶ 59; D. 58

¶ 59. [2]

## IV.   Procedural History

Plaintiffs instituted this action in state court on December 15, 2014, D. 1-1 at 4, and the

case was removed to this Court on March 27, 2015.  D. 1.  Ellis thereafter moved to dismiss.  D.

13.  The Court granted Ellis' motion to dismiss as to Doe's claim for negligent hiring, but denied

the motion as to Doe's vicarious liability claim against Ellis.  D. 22.  After the Court denied the

motion to dismiss, the parties proceeded with discovery.  The Court heard the parties on the

pending motion on June 14, 2017, and took this matter under advisement.  D. 64.

## V.   Discussion

### A.   Ellis is Not Vicariously Liable for Medeiros's Actions

The doctrine of *respondeat superior* provides that an employer is subject to liability for the

torts of its employees committed while acting within the scope of their employment.  Dias v.

Brigham Med. Assocs., 438 Mass. 317, 319-20 (2002); Restatement (Third) of Agency § 2.04

---

[2] Doe disputes the fact that Medeiros did not believe it was part of his job to fondle Doe's
breasts to the extent that those facts are premised on the phrasing of certain questions asked of
Medeiros at his deposition.  D. 58 ¶ 59.  Specifically, Doe argues that the questions at the
deposition focused on whether anyone at Ellis "asked" or "wanted" Medeiros to check for a wire
on her or pat her down.  Id.  Such questions, she maintains, shed no light on whether the alleged
physical contact was done in furtherance of Medeiros's work for Ellis.  Id.  For purposes of the
undisputed, material facts of this case, however, the Court accepts the evidence proffered by Ellis
that Medeiros did not believe touching Doe was a part of his job.  Indeed, at his deposition,
Medeiros answered "[a]bsolutely not" when asked whether he had "any reason to believe that
anyone at Ellis wanted you to check if someone was wearing a wire or recording device," D. 55-1
at 42, and answered "[n]o" to whether he had "any reason to believe that [patting down Doe was]
part of your assignment on that shop."  Id. at 43.  He also answered "[n]o" to whether "it was part
of [his] assignment on that visit to have physical contact with the plaintiff."  Id. at 44.  Doe has
offered no evidence to the contrary.

(Am. Law Inst. 2006).  To prevail on a claim of vicarious liability, a plaintiff must demonstrate both that (1) an employer-employee relationship existed and (2) the alleged tortious conduct fell within the scope of employment.  Dias, 438 Mass. at 321–22.

### 1.   Employer-Employee Relationship Does Not Exist

In interpreting the employer-employee relationship in a vicarious liability claim, Massachusetts courts use a common law test to distinguish employees who are covered by such claim from independent contractors who are not.  See id. at 321.  "The critical issue in determining an individual's status as either an employee or an independent contractor is the control over the individual. . . . If there is no right to control, then the individual is an independent contractor." Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221, 228 (D. Mass. 1990) (citing Cowan v. E. Racing Ass'n, 330 Mass. 135, 141 (1953)).  "[T]he retention of control must be such that the independent contractor is not entirely free to do the work in [his] own way."  Paradoa v. CNA Ins. Co., 41 Mass. App. Ct. 651, 654 (1996) (quoting Restatement (Second) of Torts § 414, Comment c (Am. Law Inst. 1965)) (internal quotation marks omitted).  Thus, "if in the performance of his work an individual is at all times bound to obedience and subject to direction and supervision as to details, he is an employee; but if he is only responsible for the accomplishment of an agreed result in an agreed manner, he is an independent contractor."  Athol Daily News v. Bd. of Review of the Div. of Emp't & Training, 439 Mass. 171, 175 (2003) (quoting Brigham's Case, 348 Mass. 140, 141-42 (1964)).

Doe argues that Ellis maintained control over its secret shoppers—including Medeiros—and, as such, the relationship between Ellis and its secret shoppers was that of an employer-employee.  D. 57 at 5.  In particular, Doe notes that only individuals who passed the online tutorial were eligible to secret shop on behalf of Ellis and that Ellis created the evaluative forms that secret

shoppers were required to complete after conducting an assignment.  Id.  Doe also points out that

Ellis maintained certain timetables that secret shoppers were expected to follow, such as requiring

that the evaluative forms be completed within twenty-four hours of a secret shop.  Id. at 3, 5.

Lastly, Doe explains that Ellis "monitor[s] [the reports submitted after a shop] for completeness."

Id. at 5.  These undisputed facts, Doe continues, are indicative of an employment model designed

to maintain control over secret shoppers.  Id.

    The Court disagrees.  While Medeiros was required to complete the online certification

program, he only did so one time and no other trainings or tutorials were ever mandated.  See

Santangelo v. N.Y. Life Ins. Co., No. 12-cv-11295-NMG, 2014 WL 3896323, at *8 (D. Mass.

Aug. 7, 2014) (concluding that plaintiff was an independent contractor and not an employee where

he "did not have regularly scheduled meetings outside of the one annual sales training").  An

otherwise isolated instance of training does not create the level of control necessary under the

common law test of agency.

    Moreover, the material in the online tutorial gave suggestions, not mandates for conducting

assignments.  See D. 61-1 at 18 (explaining how to complete an on-site shop).  For example, the

certification program presented secret shoppers with potential scenarios and then offered various

ways of responding if such a situation occurred during an actual shop.  Id.  The fact that the tutorial

provided suggestions and not mandatory requirements is bolstered by Medeiros's own

understanding of the certification program.  Indeed, in describing the tutorial, Medeiros explained:

> [W]hat they give you here is suggestions on answering certain questions that the
> plaintiff might have asked, okay?  So they give you suggestions.  You may choose
> one of those suggestions or come up with an equally feasible suggestion.

D. 62-1 at 4.  Additionally, because the only contact Ellis had with secret shoppers after an

assignment was through the online evaluation form, no mechanism existed by which Ellis could

know whether a secret shopper adhered to any specific suggestions outlined in the tutorial or whether he decided to deviate from what was proposed in that training.  D. 53 ¶ 27; D. 58 ¶ 27.[3]

Doe's reliance on the fact that Ellis distributed questionnaire forms to its secret shoppers and set timetables for completing work as a means of demonstrating control is also unavailing.  At Ellis's 30(b)(6) deposition, Ellis's representative testified that the reports secret shoppers were required to complete after a shop were customized by Ellis's clients.  D. 62-1 at 11.  For example, in one such instance "a client wanted to know what the shopper was told if they asked if the property accepted service animals, because [the property] had a 'no pets' policy," and, as a result, the form was adjusted to include a question inquiring about how the property manager responded to a question about pets.  Id. at 9.  The representative further explained that Ellis "honor[s] pretty much any request a client wants us to make."  Id. at 7.  That is, a client could request that secret shops occur "Monday through Friday only" or could limit shops to "between 12:00 and 2:00."  Id. at 8.  These client specific requests would necessarily alter the means by which secret shoppers conducted their assignments.  These adjustments, however, are par for the course with any independent contractor job.  Indeed:

> It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client.  For example, a builder will build a building according to the specifications of an architect.  That does not make the builder an employee.  A painter will paint a house the colors dictated by the homeowner.  That does not make the painter an employee.  In short, requiring a contractor to meet the client's technical specifications is not the type of "control" which bestows "employee" status on the contractor.

---

[3] While Doe disputes the fact that Ellis has no way of knowing what occurs during a shop, her dispute rests upon Ellis's requirement that the secret shopper contact Ellis if they have difficulty completing a particular assignment.  D. 58 ¶ 27.  Although it is true that Ellis does, in fact, instruct secret shoppers to contact them if such a scenario arises, it does not alter the balance of undisputed facts that show Ellis's lack of control over the secret shopper.

Herman v. Mid-Atl. Installation Servs., Inc., 164 F. Supp. 2d 667, 672–73 (D. Md. 2000), aff'd sub nom. Chao v. Mid-Atl. Installation Servs., Inc., 16 F. App'x 104 (4th Cir. 2001). "[C]onstraints imposed by customer demands" and "measures springing from customer demands," in other words "do not create an employee relationship." FedEx Home Delivery v. NLRB, 563 F.3d 492, 501 n. 7 (D.C. Cir. 2009). Here, the questions in the forms ultimately came from the individual clients Ellis was serving rather than from Ellis itself. Requiring that secret shoppers answer the questions requested by clients does not amount to control by Ellis such that an employer-employee relationship exists.

The fact that specified time tables could be imposed on certain assignments—which the undisputed, material facts show were determined by Ellis's clients, not Ellis—does not compel a different conclusion. The facts here are analogous to Penn v. Va. Int'l Terminals, Inc., 819 F. Supp. 514 (E.D. Va. 1993). There, the district court was tasked with determining whether truck drivers for a trucking company were independent contractors or employees. Id. at 515. In concluding that the truckers were the former, the court explained that "the fact that [Defendant] would tell [Plaintiff] when and where to pick up a load, and when and where to deliver it is not sufficient control to establish an employment relationship. [Defendant] could hardly serve its customers' needs if this was left to the discretion of its drivers." Id. at 524-25. The court continued, "[i]f a shipper requested, say, a parcel delivery service, to pick up a package for delivery across the country the next day before a certain time, it could not be seriously argued that the delivery service became the employee of the shipper." Id. In other words, mandating that certain tasks be completed within a specified time is sometimes a necessary part of serving a client. In the same way that truckers completing cross-country deliveries could be expected to pick up shipments by a certain time without shedding their independent contractor status, so too could Ellis

request that secret shoppers finish their assignments in a specified time period outlined by its clients without evidencing the control required to establish employee status.  See id.

Ellis monitors evaluation submissions and imposes minimum word lengths on certain form questions to ensure that forms submitted by its secret shoppers are complete and filled out correctly.  Contrary to Doe's position, however, these facts "do[] not suggest an employment relationship because [they are] addressed to the ends to be achieved . . . rather than the means to achieve that result."  C.C. E., Inc. v. NLRB, 60 F.3d 855, 859 (D.C. Cir. 1995) (alteration in original) (citation and internal quotation marks omitted).  For example, at Ellis's 30(b)(6) deposition, Ellis's representative explained that if a secret shopper submitted a report that said nothing more than "[i]t was pretty" in his description of a property, an Ellis reviewer would contact the shopper to provide more detail. D. 59-2 at 19-20.  That is, Ellis monitored the evaluation forms as a type of quality control to check that the answers submitted by shoppers were responsive to the questions sought by Ellis's clients.  These quality controls imposed on Ellis's secret shoppers are "constraint[s] [that] inhere[] in any subcontractor relationship."  Dole v. Amerilink Corp., 729 F. Supp. 73, 76 (E.D. Mo. 1990).  This is especially true where, as here, "a company's control over an aspect of the workers' performance is motivated by a concern for customer service."  C.C. E. Inc., 60 F.3d at 859.

Based upon the undisputed facts here, Ellis possessed little control over Medeiros. Medeiros maintained structural control over his secret shopping assignments, having the discretion to accept as many or as few secret shopping opportunities as he desired. D. 55-1 at 32-34.  Indeed, Medeiros was under no obligation to accept even one assignment and no adverse consequences could flow from his refusal to accept a particular job.  Id.  Medeiros also had complete control over his schedule and decided the date and time of the shop, within the timeframe set by the

individual client.  D. 54 at 4; D. 55-1 at 23.  In fact, Medeiros stated that he enjoyed being an

independent contractor.  D. 55-1 at 22.  When asked why, he explained:

> Well, it's freedom.  You're not required to report, punch a clock, be at a job like I
> did before.  [With Ellis] I was owning my own business. . . . There's a freedom in
> what you can do, what assignments you can chose [sic], chose [sic] not to do, chose
> [sic] when to do them.  So there's a freedom about it that was good.

Id. at 22-23; see Dykes v. DePuy, Inc., 140 F.3d 31, 38 (1st Cir. 1998) (determining that an

individual who had "control over his day-to-day business" and "set his own hours" was an

independent contractor).  Medeiros was also free to work for other mystery shopping companies

and did so.  D. 55-1 at 49.  The ability to work for other companies, even those who directly

compete against Ellis, lends further credence to Ellis's lack of control over Medeiros.  See

Ruggiero v. Am. United Life Ins. Co., 137 F. Supp. 3d 104, 116 (D. Mass. 2015) (determining a

lack of control where company did not "interfere with [Plaintiff] and his agents selling the products

of competitors"); see also Santangelo, 2014 WL 3896323, at *8 (explaining that "plaintiff [was]

clearly an independent contractor, not an employee" where he "was free to sell the products of

other life insurance companies and did so during the time he had a contract with [Defendant]").

Nor did Medeiros ever speak with any representative of Ellis.  D. 55-1 at 31 ("Q. And you never

spoke orally with anyone from Ellis.  A. I don't, no.").  Rather, his sole contact with Ellis was

through Ellis's online website or through e-mails confirming that his requests for certain shop

assignments had been approved.  Id. at 20.  Such lack of communication or supervision is

demonstrative of Ellis's lack of control.  See Paradoa v. CNA Ins. Co., 41 Mass. App. Ct. 651,

654-55 (1996) (affirming a lower court's conclusion that a company lacked control over

independent contractors where "there is no evidence of communication" between the company and

the worker and the company "did not supervise" the work performed).  Finally, while Medeiros

was provided with advice on how to conduct himself during his secret shops through the online

tutorial he completed, Ellis in no way directed or controlled how Medeiros behaved during any particular shop, nor did it evaluate his conduct during any shop. D. 54 at 5. Ellis's only interaction with Medeiros after a secret shop assignment had been assigned to him was through the submission of his evaluation forms. Id. Medeiros, in other words, was free to structure how he performed his secret shops in whatever manner he wished. Such freedom does not represent the control necessary for an employer-employee relationship. See Lopez v. Massachusetts, 588 F.3d 69, 85 (1st Cir. 2009) (concluding that plaintiffs were not employees where the entity they worked for had "no control over plaintiffs' day-to-day job performance"); see also Speen v. Crown Clothing Corp., 102 F.3d 625, 629 (1st Cir. 1996) (explaining that an employee is one who "at every moment, with respect to every detail . . . is bound to obedience and subject to direction and control").

At the motion to dismiss stage of this case, the Court articulated other considerations besides direction and control that could be considered in determining whether an employer-employee relationship exists. Specifically, this Court identified the method by which the entity pays its worker, the parties' understanding of their relationship and the location of the work as factors that may be assessed in determining the nature of a professional relationship. Doe v. Medeiros, 168 F. Supp. 3d 347, 351 (D. Mass. 2016). Here, all of these factors weigh in favor of concluding that Medeiros is an independent contractor.

First, Medeiros was paid a flat rate for each of the assignments he completed and was never reimbursed for expenses. D. 54 at 5. In addition, Medeiros's salary was never subject to taxes, withholdings or any other deductions. Id. He also did not receive a W-2, nor did he receive fringe benefits from Ellis. Id. In fact, no Ellis secret shoppers were given W-2 forms. Id. Instead, individuals who made greater than $600 were given 1099 forms. Id. These facts are emblematic of an independent contractor relationship. See Kakides v. King Davis Agency, Inc., 283 F. Supp.

2d 411, 416–17 (D. Mass. 2003) (determining worker was an independent contractor where "commission payments were disbursed without withholding, consistent with the tax rules governing independent contractors," and she received no fringe benefits); see also Speen, 102 F.3d at 633 (independent contractor relationship existed where an individual was subject to a 1099 form rather than a W-2 form).  Second, Medeiros did not work at any of Ellis's offices, which were located in Texas, and instead conducted his assignments at Ellis's client property sites in Massachusetts and Rhode Island.  D. 53 ¶ 57; D. 58 ¶57; see Lopez, 588 F.3d at 85 (explaining that the fact that plaintiffs "do not work on [company's] premises" is a factor favoring independent contractor status).  Finally, neither Ellis nor Medeiros viewed their relationship as that of employer-employee.  The Agreement between Ellis and Medeiros—which was titled "Partners in Mystery Shopping Independent Contractor Agreement"—also indicates that Medeiros was an independent contractor, see Spencer v. Roche, 755 F. Supp. 2d 250, 262 (D. Mass. 2010) (concluding independent contractor relationship exists where parties' contract stated worker "shall act at all times under this Agreement as an independent contractor.  The parties agree that [the] [company] shall not have and shall not exercise any control or direction over the manner or method by which [the worker] provides the [s]ervices"), and Medeiros testified that he was motivated to work for Ellis in part because he enjoyed the freedom associated with being an independent contractor.  D. 54-1 at 1; see D. 55-1 at 21-23.  Where both parties to the Agreement are in accord that an employer-employee relationship does not exist (and no evidence suggesting otherwise has been introduced), a third-party assertion, here by Doe, to the contrary fails.

The facts present here parallel In re Chan, 8 N.Y.S.3d 489, 490 (N.Y. App. Div. 2015).  There, the court reversed a decision of the New York's Unemployment Insurance Appeal Board that had determined a secret shopper was an employee.  In re Chan, 8 N.Y.S.3d at 490.  In

concluding that the secret shopper was, instead, an independent contractor, the court explained that the secret shopping company "did not supervise claimant, provide him with employment reviews or training or reimburse him for travel expenses." Id. The secret shopper also "signed up for assignments through [the secret shopping company's] website and had the discretion to choose any assignment that he desired." Id. In addition, he provided secret shopping services to other companies. Id. Moreover, the secret shopping company "paid claimant a fixed fee for each assignment, and no taxes were withheld from that fee." Id. Finally, the court explained that although the secret shopper was required to complete an evaluative questionnaire regarding each assignment he performed, "this fact is 'just as readily required of an independent contractor as of an employee'" Id. (quoting In re Hertz Corp., 2 N.Y.3d 733, 735 (2004)). In reaching this conclusion, the court distinguished In re Pozarycki, 738 N.Y.S.2d 748 (2002), a separate secret shopper case that had reached the opposite result. While many of the facts in In re Chan and In re Pozarycki overlapped, the court noted that unlike the situation in In re Chan, the secret shopper in In re Pozarycki received assignments directly from the secret shopping company. Id. Moreover, the company in In re Pozarycki reimbursed its secret shoppers for travel expenses. Id. Neither of those facts presented themselves in In re Chan and, similarly, neither of those factors present themselves here. See id.; D. 53 ¶¶ 16, 33; D. 58 ¶¶ 16, 33.[4]

_____

[4] Doe also points to Corp. Research Int'l v. Unemployment Comp. Bd. of Review, No. 441 C.D. 2010, 2011 Pa. Commw. Unpub. LEXIS 53, at *5 (Pa. Commw. Ct. Jan. 11, 2011), to suggest that secret shoppers are employees. D. 57 at 6. There, the court affirmed a judgment entered by the state's Unemployment Compensation Review Board (the "Board") where the company for whom the secret shopper worked never showed up for the unemployment hearing. Corp. Research Int'l, 2011 Pa. Commw. Unpub. LEXIS 53, at *6. As such, the Board accepted the uncontradicted testimony of the secret shopper, which the appellate court noted was "conclusive on appeal." Id. This decision does not undermine the undisputed evidence presented by Ellis that demonstrates Medeiros's role as an independent contractor.

Taken together, these facts demonstrate an independent contractor relationship between Medeiros and Ellis.[5]

## B.      Scope of Employment

Even if Medeiros were an employee and not an independent contractor, the actions alleged against him were not performed within the scope of any such employment.  Ellis, therefore, may not be vicariously liable for Medeiros's alleged actions.  See Worcester Ins. Co. v. Fells Acres Day Sch., Inc., 408 Mass. 393, 404 (1990) (explaining that "[a]n employer may [only] be held vicariously liable for the intentional tort of an agent if the tortious act or acts were committed within the scope of employment").  An employee's conduct falls within the scope of his employment if:  (1) it is of the kind for which he is hired to perform; (2) it occurs within the authorized time and space limits and (3) it was motivated, at least in part, by a purpose to serve the employer.  See Wang Labs., Inc. v. Bus. Incentives, Inc., 398 Mass. 854, 859 (1986).

In its ruling on the motion to dismiss, the Court determined that Doe had plausibly alleged Medeiros assaulted Doe while searching for a wire and that his search of her body could be of the kind he was hired to perform, even if it was "unlikely."  Medeiros, 168 F. Supp. 3d at 352-53.  The Court noted that Medeiros's assignment was to pose undercover to evaluate Doe's job performance.  Id. at 352.  The Court continued that, "Medeiros'[s] concern regarding a wire could have conceivably reflected the 'undercover' and 'secret' nature of his work."  Id. at 353.  Similarly, the Court concluded that the allegations could also have been plausibly motivated by a desire to

---

[5] Doe argues that there are circumstances where a company may be held vicariously liable for the actions of an independent contractor. D. 57 at 6-7 (citing cases).  Such liability, however, only attaches in those circumstances where the company directs the conduct that caused the harm, here to Doe.  Id.  Thus, because Ellis did not direct Medeiros's alleged assault, the cases Doe cites are inapplicable here.

serve Ellis.  Id.  The Court explained that "[e]ven if Medeiros'[s] view of the 'secret' and 'undercover' elements of his job, including searching for a wire, was overzealous or misguided, it is at least plausible that his conduct may have been motivated in part by a desire to protect the 'secret' and 'undercover' nature of his work."  Id.  While the claim, therefore, passed the plausibility test, it does not dictate the Court's conclusion based on a now full record of undisputed facts.

The parties have now had the benefit of discovery and Ellis relies upon undisputed evidence demonstrating that Medeiros did not act within the scope of employment.  For example, Medeiros testified that Ellis never required, suggested or instructed that he have any sort of physical contact with a shop target.  D. 55-1 at 42-44 ("Q. Any reason to believe it was part of your assignment on that visit to have physical contact with the plaintiff?  A. No.").  Indeed, he disclaimed any suggestion that Ellis may have wanted him to check Doe for a wire.  Id. ("Q. Did anyone at Ellis . . . ever tell you you had to check if someone was wearing a wire or recording device?  A. No.  Q. Did you have any reason to believe that anyone at Ellis wanted you to check if someone was wearing a wire or recording device?  A. Absolutely not.").  Moreover, the evaluative questionnaire that Medeiros completed after his secret shop with Doe included no questions relating to a wire, nor did it ask him to speculate as to whether he thought Doe might be recording him.  D. 54-3.  Doe does not dispute these facts but responds by making conclusory arguments that Medeiros's conduct was "directly related to [his] work" because it was "part of his evaluation of Ms. Doe."  D. 57 at 10.  She also asserts that Medeiros "did not grab Ms. Doe's chest for his own sexual gratification," but rather "did so as part of his covert work for Ellis."  Id. at 11.  Doe, however, provides no evidence for either contention.

At summary judgment, the Court may not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective. <u>Pina v. Children's Place</u>, 740 F.3d 785, 795 (1st Cir. 2014) (quoting <u>Cabán Hernández v. Philip Morris USA, Inc.</u>, 486 F.3d 1, 8 (1st Cir. 2007) (internal quotation marks omitted). Thus, "[i]f a nonmovant bears the ultimate burden of proof on a given issue, she must present definite, competent evidence sufficient to establish the elements of her claim in order to survive a motion for summary judgment. . . . This is no less true in . . . cases where motive is at issue." <u>Id.</u> at 795-96 (citation and internal quotation marks omitted).

If Medeiros did, in fact, assault Doe by touching her chest as is alleged, that assault appears to be sexual in nature, rather than for non-sexual purposes relating to a working relationship between Ellis and Medeiros. <u>See</u> <u>Petrell v. Shaw</u>, 453 Mass. 377, 384 (2009) (holding that rector's sexual relationship with parishioner was outside of the scope of his employment); <u>Doe v. Purity Supreme, Inc.</u>, 422 Mass. 563, 568 (1996) (holding that assistant store manager's rape and sexual assault were not within the scope of employment); <u>Worcester Ins. Co.</u>, 408 Mass. at 404-05 (holding that day-care center employees' sexual abuse of children was not within the scope of employment). Applying common law principles of agency, the Supreme Judicial Court has reasoned that "rape and sexual assault . . . do not serve the interests of the employer" and are "not motivated by a purpose to serve the employer." <u>Doe</u>, 422 Mass. at 568. Moreover, sexual abuse can never be services of "the kind [employees are] employed to perform." <u>Worcester Ins. Co.</u>, 408 Mass. at 405 (alteration in original) (quoting <u>Wang Labs., Inc.</u>, 398 Mass. at 859) (internal quotation mark omitted).

As such, the Massachusetts Supreme Judicial Court has declined to rule that employers are vicariously liable for sexual assaults even where—unlike here—an employer-employee

relationship is well-established.  See, e.g., Petrell, 453 Mass. at 383-84 (concluding that bishop and diocese were not vicariously liable for rector's sexual activity even though it was undisputed rector was an employee); Doe, 422 Mass. at 568 (declining to find vicarious liability because "plaintiffs . . . failed to allege facts that would show that the assistant store manager was acting within the scope of employment" when he allegedly committed rape and sexual assault); Worcester Ins. Co., 408 Mass. at 404-05 (ruling that sexual assaults committed by salaried director-level employees "[did] not trigger vicarious liability" against day-care center).  Thus, as a matter of law, if Medeiros's assault of Doe was sexual in nature, his actions necessarily fall outside of the scope of his employment with Ellis.

While Doe cites a range of cases in which courts held that an employee's conduct fell within the scope of employment or that a reasonable jury could have found such, these cases are inapposite because the conduct examined in the cited cases are not acts of sexual misconduct.  See, e.g., Manning v. Grimsley, 643 F.2d 20, 22, 24 (1st Cir. 1981) (holding that jury could find pitcher who threw a ball at heckling spectator was acting in response to an interference with the pitcher's ability to perform employment duties); Meyer v. Runyon, 869 F. Supp. 70, 78-79 (D. Mass. 1994) (ruling that postal service officials' conduct underlying a tortious interference and defamation action was within the scope of employment because they were engaged in the kinds of activities they were hired to perform); Howard v. Town of Burlington, 399 Mass. 585, 586, 591 (1987) (concluding town's committee chairwoman was acting within the scope of employment during a discussion that led to a defamation action against her); Commonwealth v. Jerez, 390 Mass. 456, 458 (1983) (concluding consul's alleged assault of police officer occurred while consul was engaged in exercise of consular function under Vienna Convention); Suckney v. Bert P. Williams, Inc., 355 Mass. 62, 64 (1968) (holding that jury could find that a delivery driver's helper was

acting within the scope of employment when he assaulted the plaintiff because he was hired to ensure that deliveries were delivered, even if it required force); <u>Harris v. Devos</u>, No. CA 93803B, 1996 WL 1185142, at *4-5 (Mass. Super. Ct. Mar. 15, 1996) (concluding salesman acted within the scope of employment in assaulting taxi driver who interfered with salesman's ability to impress employer's clients).[6]

In sum, Doe has provided no evidence to support an inference that Medeiros acted within the scope of his employment when he allegedly assaulted her.

**VI.   Conclusion**

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 51.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[6] In arguing that Medeiros was acting within the scope of his employment, Plaintiff discusses at length <u>Jerez</u>, 390 Mass. 456, 458 (1983). D. 57 at 9-10. <u>Jerez</u>, however, does not aid Doe's argument here. In <u>Jerez</u>, the Supreme Judicial Court determined that a consul was immune from prosecution under the Vienna Convention for the alleged assault and battery of a police officer. <u>Id.</u> at 458, 463. The Supreme Judicial Court's analysis turned on its interpretation of the scope of the Vienna Convention, "the scope of a consul's functions and consular immunity." <u>Id.</u> at 460. The court held that the consul's conduct occurred in response to the plaintiff-police officer's conduct that was interfering with his ability to perform his duties under the Vienna Convention—in this case attending a cultural gathering. <u>Id.</u>